Good morning all. Our first case for argument this morning is Sinn v. Lemmon. Ms. LaPointe. Thank you, Your Honor. May it please the Court. My name is Mary Jane LaPointe. I'm with LaPointe Law Firm in Indianapolis, representing Dylan Sinn, and I'm reserving five minutes for rebuttal. Dylan Sinn was a victim of inmate-on-inmate violence at the Putnamville State Prison in Indiana. The primary claim in this case is against the prison counselor who failed to protect him when he reported threats both orally and in writing. In April of 2014, Dylan Sinn was in an open dormitory housing 140 inmates with one guard who may or may not be at the security desk and security cameras that routinely were not monitored. The Vice Lords gang operated in the prison. He was attacked by members of the Vice Lords on April 24th of 2014 in a latrine. It's on video, not the actual attack, but going into and out of the latrine along with two other white inmates who had tried to help him. His footlocker was ransacked. He was probably attacked because he had some new tennis shoes. He was punched in the face repeatedly. Then after the incident, two guards show up. There's bars separating these 140-man dormitories, so I believe you've got one guard from each side who showed up. They didn't show up for three and a half minutes after the attack. When they showed up, they pulled out the video and watched the video along with Dylan Sinn and the other two white inmates who had been victims who they'd handcuffed. They hadn't done anything to anybody else. While they were handcuffed watching the video, together they all identified the black guys who were milling around as members of the Vice Lords and called them by their nicknames. The guards, Rogers and Hoskins, because it was close to the end of their shift, said they didn't want to hassle with doing anything. They didn't put Dylan or the other moved Dylan and the two other victims to another dormitory with 140 inmates and one guard. Ms. LaPointe, good morning. Judge Rovner here. Where in your brief in the district court did you respond to the defendant's qualified immunity argument regarding the claims against Rogers and Hoskins? Yes, Your Honor. I understand that we've been accused of waiving that. My co-counsel in this case, I think, would concede that he didn't brief it as well as he could have. On the other hand, he didn't have a separate category in the brief called qualified immunity. On the other hand, he went through the case law. He went through the facts. He talked about Rogers and Hoskins. He talked about the Supreme Court case in Farmer v. Brennan. I think he covered it and particularly covered it well enough for purposes of judgment on the pleadings because Rogers and Hoskins were a plausible factual scenario to get past judgment on the pleadings, which I think that was done. And so I think, as I said, I think he could have briefed it better, but I don't think he waived it because enough was said both in the pleadings and in the brief. Ms. LaPointe, can I ask you a question related to Mr. Sinn's response, the one filed on May 2nd of 2016? I appreciate your candor that it could have been briefed a little bit more directly, but was there not another round of briefing on motions to reconsider that occurred as well? And didn't that lead the District Court judge, if I remember correctly, to say the real problem on the qualified immunity issue is that there's no specific briefing dedicated to the Prong 2 question, that is, what law is clearly established? And that appears on page 244 of the appendix in that motion, the ruling on the motion for reconsideration. So isn't that part of what we should consider as well? Yes, Your Honor. The briefing on the motion to reconsider? Yes, Your Honor. And I guess in response, the initial brief with the reference to Farmer v. Brennan, which is a seminal case that sets out the standard, and also with reference to the federal jury instruction, I believe there's a reference to that as well, 7.16, which the standard is well established. It's been around for a long time. So yes, you are certainly right about that subsequent briefing as well. To turn back to the person that I think is most responsible for dropping the ball, that would be Mr. Brush. After being moved to the second open dormitory, Dillon approached the counselor, Mr. Brush. They talked about the situation. Brush already knew about it. He congratulated Dillon about how he handled himself. Dillon testified in his deposition that Brush was a savvy guy. He knew how the gangs worked. And Brush didn't do anything. So the next day, April 26, Dillon put his report in writing to Brush, whom everyone, including the superintendent, agreed was the person that Dillon was supposed to make a report to. And he put the letter under his door. That letter's in the record. Dillon explained what happened in the prior assault, and he explains in that letter that the two white guys who were moved with him were immediately assaulted again, and that he was next. He didn't use the term vice lords, but that isn't dispositive because basically the case law says that you don't have to be able to identify the perspective assailant. Dillon then filed a grievance two days later when nothing was done. So he knew it was coming. He told Brush personally, put it in writing twice. Then the attack came on April 30, and his leg was broken in two places. His jaw was fractured. His nose was broken, multiple contusions, two surgeries. The video, again we have video that shows seven African American men followed him into the hospital. After lights out, when they were supposed to have been in their beds, there was no guard around. And like the first time, no guard shows up for over three minutes. And in fact, if you watch the video, the video runs out. So it could have been a lot longer than three minutes before anybody got there at all. Mr. Point, can I ask you a question? Is it possible you're understating the record on this? And you said, there's no specific reference to vice lords. That's literally true. But in the letter, he said, I'm not affiliated. Right? What else could that possibly mean? Exactly. Exactly. And Brush was aware. He testifies clearly, and his deposition was in evidence. And he says Brush knew how things worked. That had to mean he knew how the gangs worked. And the superintendent testified, moving somebody wasn't necessarily enough to protect you from a gang, whether you move to another dorm or whether you even move to another facility. So they didn't offer any protective custody, which is the Powell v. Posten case, where you have an inmate who's like Dillon Sin. He's a snitch. But he doesn't complain. He only says inmates were pressuring him. He's repeatedly offered protective custody, and he says no. And so I think, you know, the trial court doesn't really point out the fact that Dillon Sin was a snitch. But when he can see him with those two guards, and they all identify the people on that video, that turned those three white guys into snitches. That's why they were targeted. Under the Brennan case, if, as I said, you don't need to show the victim is a transsexual, he didn't complain at all. He didn't put anybody on notice personally. But the court found that the risk was obvious. And here, the risk had to have been obvious. And when you're talking about summary judgment, all the inferences are supposed to be in favor of the plaintiff, as Your Honor points out. There's certainly enough in the record to keep Mr. Brush in this case. The risk, again, under Farmer v. Brennan, can be evaluated based on the susceptibility of the plaintiff, not just on the adequacy of the notice. And here we have a susceptible from the other one primarily relied on by the appellees, which is Lewis v. Richards. There, Lewis goes five months without anything happening. He never told anyone that he was threatened. After he was moved to a different location, Sin reported that the two white guys were hit after the move, and that he was next. It was six days, am I correct? Pardon me? Six days between the two attacks? Correct, Your Honor. Correct. Okay. We do have, in addition to the guards, two administrators in this case. They were dismissed on summary judgment. We have appealed their dismissal on the basis of their liability as supervisors in their individual capacities, because they're liable if they know of and disregard a risk to inmate health and safety. They admittedly did not know of a specific risk to Dillon Sin. They hadn't heard about the initial assault, but we argue that if there is well-known gang activity in conditions that foster this sort of violence, then the administration can be liable. The primary source of the factual information for this lies in the report of our expert, Michael Berg, that's in the record, but the trial court rejected it, saying that Michael Berg had too many legal opinions. He wasn't going to accept it. But really the legal opinions at the end of the report, and it's a long report full of facts, and at the beginning he lays out all of the different documents that he looked at in reciting those facts. So if all of those facts are considered, we believe there is enough evidence to keep those two administrators in the case, and that they should also not have been dismissed on summary judgment on the basis that the risk should have been obvious in that kind of a prison setting. And I'd like to save the remainder of my time. All right. Thank you, Ms. LaFontaine. Mr. Kripp. Good morning, Your Honors. May it please the Court. Good morning. District Court's judgment should be affirmed for three reasons. First, Mr. Sinn's claim against John Brush fails because no reasonable jury could infer that Brush actually knew that Sinn was in danger in his new dorm. Second, there's no evidence that Putnamville suffered from rampant gang violence, a reign of terror, or other systemic deficiencies. And third, Mr. Sinn waived his claims against Rogers and Hoskins by failing to respond to their qualified immunity arguments at the judgment on the pleading stage. Now, Mr. Kraft, is it not enough for a prisoner to say, I have been attacked by gang members, and you can see which ones in the video that you have. And they have threatened that other gang members will attack me in the future. But I don't know which one of them it will be. Is that not specific enough? And if not, how could a prisoner ever get protection from such a future attack? Well, Judge Rovner, I do think that would be specific enough. But that's not what happened here. He did not identify gangs. He didn't say in his letter that there was a gang hit out on him. And although he testified that members of the vice lords came to him when he was first moved to 18 South and threatened him, he did not report that threat to Brush. And so look, he may not have used the word gang in his letter to Brush, but he used it in his grievance form. And he did say in his letter to Brush, that he was not affiliated as my brother, Judge Scudder just noted. Are these two things together enough to make a specific complaint? No, Your Honor. First off, with the April 28th grievance, there's no evidence and Mr. Sin has never argued that Brush actually received the April 28th grievance. And as Mr. Brush testified in his deposition, he was not the person to whom grievances were given. He wasn't involved in the grievance process. So he didn't receive the April 28th grievance. With regard to... Would it be your position that if a prisoner makes an almost specific enough complaint to one prison employee and another almost specific complaint to another prison employee specific enough, he still loses because he didn't make the complaint to the same person? Yes, that is our position. Because under Farmer, it's a subjective standard. It's what the defendant actually knew. It's not what he should have known. And it's not whether he should have investigated to find out more information. You can't impute knowledge under Farmer from one correctional officer or correctional employee to another. But the prison has an entire staff dedicated to knowing who is in which gang. So that information would always be or would normally be, should I say, within the hands of the attack? Yes, it would. But again, the fact that the prison writ large possesses that information says nothing about whether this particular defendant actually knew that a gang hit was out or that the defendants that he had been assaulted before, and that he feared for his life. But what he didn't tell them was that he was subject to a gang hit. And that on the day of the second assault, he received a threat from the gang members who ended up assaulting him again. And this court said that without those extra pieces of critical information, there was nothing that would have led the defendants to believe that the plaintiff himself wasn't speculating based on the prior assault. And I think that's what is missing here, is that nothing in the letter says he has a gang hit on him. Nothing in the letter says that they're after him because they believe he's a snitch or for some other reason. Nothing in the letter says that, look, when I got moved to this new dorm, and I think that's an important fact that's different from Klebanowski even, there's nothing in the letter says when I was moved to this new dorm, other gang members came up to me and said, you're not safe anywhere. We are going to get you for the prior assault. Look, at the very least, okay, at the very least, isn't there a dispute here as to whether Brush's knowledge of substantial risk to sin can be inferred from everything? Well, I don't think so under this court's cases. I mean, this court has sort of drawn a line between the two specific, I'm sorry, the specific enough threats from the two generalized threats. And as I explained, this case falls squarely on the side of the line of two generalized. This case is like Klebanowski and Lewis. Well, why isn't it like Brown versus, what is that, Buds or Buds? Which, you know, says it's, it's well settled that deliberate indifference may be found at the specific intensity of the ultimate assailant is not known in advance of the assault. Right. Well, I guess the problem there is that there's no evidence. If we're going to analogize to Brown, there's no evidence here that Chauncey Davenport or Marquette Neal, the two offenders who engaged in the second assault, were the sort of Cobra, as Billman sort of talks about, that they had a propensity to attack white offenders or unaffiliated offenders or anything. There's no evidence really about them at all. And I think that's what distinguishes. But the prison, the prison did act after the first attack. They identified the attackers. But it doesn't appear that they did anything with the information. They did identify two of the attackers from the second attack, and they referred them to the prosecutor. But of course, that's after. I'm sorry, Judge Rilker, you cut out. They actually let them out of prison. I'm sorry, you cut out a bit there. The second time to a point, I mean, he was attacked so badly, they let him out of prison early because they believed they couldn't, you know, protect him. Well, I do want to clarify a point on that latter point. But first, the fact that Rogers and Hoskins were able to identify the attackers after the first incident, and let's keep in mind, that's going off of Senn's allegations, which we accept is true, his testimony, because they did not designate any evidence from Rogers and Hoskins. Okay, but the fact that Rogers and Hoskins knew says nothing about whether Brush knew. Again, we're not talking about imputed knowledge, or a negligence, or an objective reasonableness, or even an objective recklessness standard under Farmer. It has to be actual knowledge by the defendant, and it also has to be personal involvement. That's the fundamental principle of 1983. With regard to the sentence modification, I would just like to clarify for the court that the Department of Correction's attorneys don't handle sentence modifications in state court. Those are handled by prosecutors. And so that is not some sort of concession by the Department of Correction, and I don't take Mr. Senn to have argued that at any point, certainly not on appeal, and I don't believe he argued that below. Mr. Kraft, can I ask you a question about the letter that went to Officer Brush? Yes. The letter says, I'm not affiliated. How do you interpret that? I'm not affiliated. Under the summary judgment standard that we're operating. What should we make of it? I'm not affiliated, may make this a closer case on that respect from Klebanowski, because I think it's difficult to come up with a reason that you would say that if you weren't mentioning or alluding to gangs. But let's also remember that Mr. Brush testified that it's not just the vice lords. There are numerous gangs involved in prisons, and you can't infer just because he says black inmates did this to me that they're all gang members or this has something to do with a gang. He didn't specify that there was a gang hit. He didn't specify that he was being threatened. And again, he had been moved to a new dorm. So there's no specificity in there to suggest that he was in danger in his new dorm. Now, if he had stayed back in 11 South, if he had not been moved, then that might be enough to make it a jury question. But the fact that he has been moved really brings this case close to Lewis. Would we be wrong, in your view, under the standard we have to operate on on appeal, to read the sentence, I'm not affiliated, as tantamount to him saying, I'm worried about the vice lords, period? I don't think that is a reasonable inference, even under the summary judgment standard. I think it's too speculative. I think at most, what that phrase does, that phrase of the letter does, is say that maybe Brush, probably Brush should have investigated further. But as this court explained in Olson, failing to investigate further to acquire the information to know that there's a substantial risk of harm is negligence. At most, it's negligence, and that's not actionable under Farmer. Mr. Craft, what do you make, if anything, of his references to the divide along racial lines as evidence of concern for a future attack? Well, I think here the district court was absolutely right. That is just far too generalized of a complaint to give a defendant notice that he's actually at risk. The underlying premise of that is that all black inmates are a danger to me because I'm white. There's no support. That's entirely speculative. Or, what's worse, all black inmates are gang members, which there's no support in logic for that. And I think that's just speculation, and I don't think that's a reasonable inference to draw there. With regard to the claims... And forgive me, Mr. Craft, but how would you factor in the fact that he did mention gangs in the grievance form? Or is it just not a factor? Yes, Judge Rovner, it's not a factor because there is no evidence at all that Brush received the grievance form. And since Brush didn't receive the grievance form, he could not have known that fact. Now, with regard to the claims against Knight and Lemon, Mr. Sin does not cite any competent evidence to support his allegation of rampant prison violence. He relies on the Northcutt and Dunham affidavits, but as the district court pointed out below, and as we argued in our appellee's brief, neither of those two persons has personal knowledge because they weren't employed during the time of this incident. Dunham quit his employment in 2012, and Northcutt was employed in 2016. Despite the arguments there and the clear application of the legal rule, Mr. Sin fails to respond to that, even in his reply brief, and in fact doubles down and relies on that. The only evidence he has of any sort of problem is the anecdotal evidence of his two assaults and the alleged assaults of the two other white inmates. But as this court held in cases like Lewis, Palmer, and Smith, that sort of anecdotal evidence isn't enough, nor is the expert report enough. I will point out, firstly, that the only part of the expert report that he actually cited below was the two paragraph conclusion. The district court was really clear about this, and that was chock full of legal conclusions. He can't come now on appeal and get another bite at the apple and start citing all these other parts of the report. But even if you put that aside, those parts of the report never identify a concrete systemic deficiency. At most, it's the sort of speculation, or the facility should have known, or this could have been avoided, or this is likely to lead to violence in the future. It's that type of speculation that this court rejected in the James case. And I think this is indistinguishable from that. This case is not Walsh. Mr. Sinn has not come forward with a statistical study showing that there is prevalent violence or identifying the number of inmate-on-inmate assaults at Putnamville. He also has not come forth with a statistical study evaluating gang influence. And I'd also point out that, yes, as Superintendent Knight testified, gangs, as everyone knows, are an issue nationwide, and Indiana's facilities aren't immune from that. But the commissioner and the superintendent have taken reasonable steps to abate that risk. They try to maintain their officer ranks as aggressively as they can, but correctional officers are a tough job, and they end up with some shortages. But they try to fill them and keep it adequately staffed. They have a policy on gangs that's intended to snuff out gang violence and other gang-related issues proactively. They have a gang membership monitor at each facility. They train their employees on these policies. And I'd also just remind the court that mere months before Sinn unfortunately suffered his injuries, the American Correctional Association accredited the facility because it had met 100% of their mandatory standards. Lastly, with regard to- Even though they had 27 vacancies in the prison guard ranks? Well, Judge Rovnes, 27 vacancies out of 350 positions. And it's far less than the 70 that Sinn alleged, but he doesn't have evidence to support. I'd also point out that the superintendent testified that he tries and he can't say with absolute certainty that there's never just one guard per dorm. But it should always be two. And, in fact, on the days that Mr. Sinn was assaulted, there were two guards on duty in the 11 South and two guards on duty in 18 South, respectively, on top of the rapid response teams. Mr. Kraft, do you accept that Mr. Brush was aware of the attack on the other two inmates after they were relocated? I don't accept that he was aware of that. Now, I accept that Mr. Sinn alleged that in the letter, but Mr. Sinn does not say in the letter how he knows that. I think, more importantly, he doesn't say in the letter that it's related to the initial incident. And, again, this happened in yet another dorm. Is he trying to underscore that possibility occurring to him that relocation wasn't sufficient to gain the protection he sought? Well, I think maybe that's what he's getting at. But, again, those gentlemen were in another dorm. He says nothing about the threat in the dorm that he is in. And, you know, the dorms are separate. This isn't like they were in another side of the dorm. They were in a completely different dormitory. And I think, lastly, I'd just like to touch real quick on Rogers and Hoskins. I think the court acknowledges they did not respond to the second prong of the qualified immunity argument, either in the response to the motion for judgment on the pleadings or in their five-month-late motion to correct error. All they argued was that Twickball or, I'm sorry, Twombly and Ickball are satisfied. They didn't respond to the argument that even if we accept the allegations are true, you haven't shown a violation of clearly established law. And even if you put their waiver aside, Rogers and Hoskins moved Sin to a new dorm. That's precisely what the defendants did in Lewis. And this court held in Lewis that that was a reasonable response. And for that reason, Rogers and Hoskins would not have known that they were violating clearly established law. In the end, Mr. Sin's arguments depend on what he thinks the defendants should have known as opposed to what they actually knew. And he seeks to hold them liable because they didn't exercise better judgment. But that's not a valid Eighth Amendment theory, and we therefore ask that the court affirm judgment. Thank you. All right. Thank you, Scripps. Ms. LaPointe? Thank you, Your Honors. I just have a few additional points. A counsel argues that what Brush actually knew or didn't know can't be inferred. And the trial court would seem to agree with that and be very nitpicky that if he doesn't use the word gang, he's not protected. But I believe that not just Farmer but the case law in general, whenever you have a subjective standard where you have to determine intent, nobody can get inside somebody's head and figure out what they actually intended. But we have to infer that from the facts. Intent is literally always inferred unless there is direct evidence. And as counsel knows, typically I handle employment cases. And in employment cases, intent is always an issue. And you very rarely get direct evidence where somebody says, you know, by gosh, I'm going to violate your rights somehow. Instead, you infer that intent from their actions, and that's what I think you need to do here. Yes, is there evidence that the gang said, we are going to get you? And counsel said, no, there's no evidence that the gang said that. But the trial court, actually in the trial court opinion, the fifth page of the trial court opinion, Judge Lawrence says between April 24 and April 30, Sin was threatened by members of the Vice Lord Gang. They threatened him because he defended himself against his property being taken and because they believed he was taking steps to talk with the officers about his safety. They knew that he got pulled out, spoke to officers, and was moved. They were making it clear what their intentions were. So as a matter of fact, the judge is finding, yes, the gangs were after him. Now, did Brush know about that? Well, not only can you infer Brush's knowledge from what was in the letter, but the testimony from Dylan Sin, which is actually he's pretty articulate for a prisoner. He writes a pretty good letter, and he testifies pretty clearly. This is at page 116 of the appendix. He says, when he talked to Brush, he already knew about the situation, didn't call me out on his own, and then this happened. I kind of have some animosity toward that. I mean, I feel in some type of way that I reached out to him. He knew it was going on. He was fully aware of all of it before he even talked to me. And then afterwards, he didn't do anything about it as far as he knew the system well enough to know what was messed up about it. He knows how it works. He's been around a long time. He knows what doesn't work, what does work. He knows about the STG gangs, security threat groups. He knows about how much authority they have. So I think when there's a conversation with this counselor, where they're talking about the prior assault, and even the trial court finds that prior assault was vice lord's, that whether Brush knew can pretty darn clearly be inferred. And then I guess the bigger question, I think, as Your Honor was pointing out, is what else could Dillinson have done? He got a letter referring to affiliation. He talked to Brush, and then he filed a grievance. And even the superintendent is testifying at page 154 in the appendix. The question was, if you just separate the two people who have the conflict, does that not ensure the safety of the individual who feels threatened if it is, in fact, a gang? Do you agree with that? Well, yes. And so the superintendent goes on to talk about knowing that there are gangs in the prison and knowing that moving someone is not sufficient. Thank you. Again, when you were talking about the standard and whether the law was clearly established and whether someone acted reasonably, I believe that that was appropriately briefed. It just wasn't briefed in the context of a subheading talking about qualified immunity. Of course, the whole issue of deliberate indifference and qualified immunity and acting reasonably overlaps. So if somebody is deliberately indifferent, they're not going to have acted reasonably for purposes of qualified immunity. And I think that that is demonstrated when you look at this court's failure to protect jury instruction because it doesn't use the words deliberate indifference. It's not going to confuse jurors with a word like that, but it sets out the standard in pretty common language. So our position is that Dylan did everything he could by reporting and that he did a pretty darn good job of that for a prisoner. And that if this isn't good enough, our fear is that you send to the prison officials the message that you don't have to do anything, that the gangs really have free reign, and that we're not going to do anything to try to protect somebody from a very serious assault. Thank you. Thank you, Mr. LaPointe. Thank you, Mr. Kraft. The case is taken under advisement.